UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

    John C. Draper and
Deborah H. Draper,

        Debtors.

Case No. 17-26352-beh

Chapter 7

---

Robert 100, LLC,

        Plaintiff,

v.

John C. Draper,

        Defendant.

Adversary No. 17-2296

---

**DECISION AND ORDER DISMISSING COMPLAINT**

---

    Plaintiff Robert 100, LLC alleges that it relied upon a false financial statement to enter into a commercial property lease agreement with Viridian Group, LLC ("Viridian") for a West Allis, WI restaurant premises owned by the plaintiff. Robert 100 asserts that the debtor, John C. Draper ("Draper"), signed both the financial statement and the lease. The lease was breached shortly after signing, and so Robert 100 asserts the lease debt should be nondischargeable under 11 U.S.C. section 523(a)(2)(B). Robert 100 obtained a state court default judgment against Draper, and against his son, John C. Draper II, for $40,817.33, for damages related to the breach. POC 5-1, Attachment 1.

    Draper denies all of Robert 100's allegations, and denies any intent to enter into a lease on behalf of Viridian. Rather, he testified that the financial statement and lease were signed by his son, John C. Draper II, and were signed without Draper's knowledge. His son, John C. Draper II, was both President and Chief Operating Officer of Viridian Group, LLC.

The plaintiff and the debtor consented to the Court's jurisdiction to determine the existence and extent of any debt owed. The following facts were contested: (i) whether Draper executed the lease, and (ii) whether Draper made the written financial statements presented to Robert 100. Assuming there is a debt, the primary legal question presented is whether the debt owed to the plaintiff is nondischargeable under 11 U.S.C. section 523(a)(2)(B).

The Court held a trial, and in its closing argument, Robert 100 raised an additional legal theory. Its counsel asserted that because Viridian Group, LLC (Wisconsin) was administratively dissolved on June 9, 2015, little more than a month before the lease was executed by Robert 100, Draper and his son were acting as a partnership and each had a partner's joint and several liability with regard to the lease. Robert 100 cited Wisconsin Statute sections 178.0202(1) and 178.0306 for this new theory.

The Court has jurisdiction in this matter, because it is a core proceeding under 28 U.S.C. section 157(b)(2)(I), as it relates to the dischargeability of debts. The following constitutes the Court's findings of fact and conclusions of law.

## FACTUAL BACKGROUND

At the trial, the debtor, John C. Draper, testified that he is retired from a career in the restaurant business. Before he retired, he and his son formed Viridian Group, LLC (Wisconsin) and Viridian Group, LLC (Michigan) with the intent to open restaurants in Wisconsin, where Draper lives, and in Michigan, where his son lives.

Draper and his son each held a 15% interest in Viridian (Wisconsin) and a 15% interest in Viridian (Michigan). Investors held the remaining 70% in each of these LLCs. Draper testified that he and his son operated Viridian Group, LLC[1] via a "stay in your lane" division of responsibilities. His son's titles were "COO" and "President" and his son's role was to run the business,

---

[1] In his testimony, Draper often appeared to use the term "Viridian Group" collectively, to include both the Michigan and the Wisconsin entities.

develop the company, and look for properties to develop. Draper's title was "CEO" and his role was to advise his son and to "make sure the job gets done."

Draper knew the owner of Pie Five Pizza Group from prior restaurant experience. Draper testified that in April or May 2015, he signed a Pie Five franchise agreement on the LLC's behalf to enable the Viridian Group to operate pizza restaurants in Michigan and to expand into Wisconsin. No franchise agreement was offered into evidence. Draper testified that the plan was to create a separate LLC, under Viridian Group, LLC, to open and operate each Pie Five pizza restaurant.

The plaintiff's counsel presented Exhibit 1 to Draper. This was a document from the Wisconsin Department of Financial Institutions which indicated that Viridian (Wisconsin) was formed in April 2012 but was administratively dissolved on June 9, 2015. Draper testified that he was unaware in 2015 or 2016 that the Wisconsin entity had been dissolved. Also, he testified he had no information regarding the Michigan entity's status.

Draper testified that shortly after he signed the franchise agreement, a Southfield, Michigan restaurant opened in May 2015 but closed in February 2016. Draper said a Wisconsin restaurant never opened due to lack of a suitable location and cash flow. Draper testified that although he was aware that his son was looking for properties to develop as Pie Five restaurants, Draper himself lacked detailed awareness of any Wisconsin location. Draper asserted that he never took the operational reins, only getting involved near the end of the LLC's existence to manage payroll and to make one deposit (after receiving a call from an employee). He testified he never was involved in the LLC's day-to-day affairs.

The lease with Robert 100 describes the West Allis premises as a shopping center to be constructed on Highway 100. The term of the lease is five years, with an option to renew for another five years. The commencement date was anticipated to be July 1, 2015, although the lease is hand-dated July 27, 2015. CM-ECF Doc. No. 14-1, at 1. Paragraph 1.17 notes that the security deposit is to be $5,733.33, and paragraph 1.18 states "upon review of

financials, Landlord will evaluate requirement for personal or corporate guaranty." The tenant's trade name is listed as Pie Five Pizza Co. *Id.* at 3.

More critical for this dispute, Draper testified that he was not the "John Draper" who signed the lease. Rather, he testified the signature that appears on the lease is in his son's handwriting. Draper noted his son signed the lease as "president." Although a junior, he said his son does not always use "II" as part of his signature. Draper, on the other hand, signs "John C. Draper" and, he says, has different handwriting. Draper offered his bankruptcy petition signature page, Exhibit 100, and legal services agreement, Exhibit 101, for comparison purposes. Draper testified that he was not present when the lease with Robert 100 was signed. Draper did not see the lease until he was served with the adversary complaint. He is not aware of any lease payments made to the plaintiff.

Exhibit 3 consisted of four pages. The first is a July 6, 2015 letter from Mr. Okonkwo M. Jackson, a relationship banker at a Chase Bank in Lathrup Village, Michigan. The letter is addressed to Viridian Group, LLC in Birmingham, Michigan, and references a single account number, with John C Draper I and John C Draper II as both authorized account signers and members.

The second page of Exhibit 3 is titled Deposit Account Balance Summary, on Chase Bank letterhead, shown as requested by Viridian Group, LLC at the Birmingham Michigan address and completed by the same Mr. Jackson. The summary lists Viridian Group, LLC as the sole owner, with both Drapers as signers. The platinum business checking account was opened on November 3, 2014, showed a current balance of over $8,000,000 and an average balance of over $6,000,000.

The third and fourth pages of Exhibit 3 are on Viridian Group, LLC letterhead, with the Birmingham, Michigan address. They are identical, except that page 3 includes a signature, apparently of John C. Draper, COO, with a date of June 30, 2015, and page 4 has no signature or date. Otherwise, the

same dollar amounts appear in the assets and liabilities columns. Notably, the sheet shows $8,500,000 in a Chase bank account.

Draper testified he did not know who authorized Exhibit 3 or who signed it. Draper also testified he did not know of franchise licenses worth $3.9 million or of any Viridian LLC account holding $8 million; instead he thought there might be $30,000 in the Viridian (Michigan) account.

Robert Schmidt then testified. Mr. Schmidt is the managing member of Robert 100, LLC. Schmidt said a broker had approached him about a possible tenant named Viridian Group, LLC that was interested in operating a pizza restaurant at the plaintiff's West Allis property. According to Exhibit 2, that broker was Josh Minkin, of Alpine Commercial Real Estate. CM-ECF Doc. No. 14-1, at 3. Schmidt said it was typical to be approached by brokers on behalf of tenants. According to Schmidt, he relied on the financial statement and bank statements in Exhibit 3, provided by the potential tenant, when Robert 100 agreed to enter into the lease. Schmidt admitted he did not see who signed the financial statement. He acknowledged the $3.9 million shown on the financial statement as the value of franchise licenses was "a big number," but testified the broker, Minkin, had told him Viridian had purchased plus or minus 100 franchise opportunities. Schmidt did not require a personal guaranty along with the lease due to the purported financial strength of the prospective tenant Viridian Group, LLC. Schmidt did not check any public records and did not know that the (Wisconsin) LLC had been administratively dissolved.

Schmidt testified that he put in several calls to the banker at Chase Bank, whose name appears on Exhibit 3, and eventually spoke with him. He also noted that when he considers a new retail concept, he does some internet searching on that concept. Schmidt testified he did some internet search about Pie Five before signing the lease, but did not speak with anyone from Pie Five corporate until after Viridian defaulted.

After he signed the lease, according to Schmidt, Robert 100 commenced building out the space per the "Landlord's Work" provision of the lease and made improvements to the space, even though the LLC had not received any security deposit from lessee. He explained that this advance-work procedure is consistent with the lessor's practice of "often" receiving deposits at the time it collects rent. Schmidt acknowledged, however, that as a result of the non-payment problem with Viridian, Robert 100 has changed its practices and inquiry as to the validity of potential tenants going forward.

Schmidt testified that Viridian never paid any rent after the lease signing, and the premises went unlet for more than a year until a different restaurant opened at the site in 2017. Lease paragraph 24 in Exhibit 3 provides for recovery of lost rents. The plaintiff documented its damages from the breach of lease in both a default letter and ultimately the state court default judgment it obtained. POC 5-1. The state court order awarding a default judgment contains no factual findings. *Id.*

## ANALYSIS

11 U.S.C. section 523 provides that a discharge under section 727 does not discharge an individual debtor from certain obligations. Under section 523(a)(2)(B), debt is not dischargeable to the extent it was obtained by use of a written statement "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." A creditor alleging a debt to be nondischargeable under section 523(a)(2)(B) must establish these four elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290 (1991). In addition, exceptions to discharge of a debt are construed strictly against the creditor and liberally in favor of the debtor in order to grant debtors a fresh start. *Shaw Steel, Inc. v. Morris (In re Morris)*, 223 F. 3d 548, 552 (7th Cir. 2000).

**Existence and Amount of Debt**

The plaintiff presented evidence of a debt. Robert 100 provided the state court default judgment as the basis for its proof of claim in Draper's main bankruptcy case. POC 5-1. Draper did not file an objection to the proof of claim, although in his answer to the adversary complaint he "disputed the claim."

> Under Bankruptcy Rule 3001(f), a creditor's proof of claim constitutes *prima facie* evidence of the validity and amount of the claim. This presumption places the burden of producing evidence to rebut the claim on the Debtor. If the Debtor presents sufficient evidence to rebut the presumption, the burden then transfers to the creditor to assume the ultimate burden of persuasion on the issue of the value of the collateral securing its claim.

*In re Spraggins,* 316 B.R. 317, 319 (Bankr. E.D. Wis. 2004); *In re Nejedlo*, 324 B.R. 697, 699 (Bankr. E.D. Wis. 2005) (mere denial of the validity or amount is not sufficient to sustain an objection to claim, objector must produce some evidence to overcome presumption of validity).

At trial, Schmidt described the lease between Robert 100 and Viridian. He also testified regarding costs incurred by the plaintiff under the lease to ready the premises, and the expenses incurred after Viridian failed to assume the tenancy and the property had to be remarketed. Robert 100 alleges that the debt (as reflected in the state court judgment) is for property or services provided by Robert 100 to Viridian Group, LLC. The lease, Exhibit 2, sets out the agreement between Robert 100 and Viridian Group, LLC for use of Robert 100's West Allis premises to operate a Pie Five Pizza restaurant. Draper acknowledges that he was a member of Viridian Group, LLC and also acted as its CEO. The lease lists the tenant's address for notices as Viridian Group LLC, 345 Brown Deer, Bayside, Attn: John Draper. This is Draper's home address. That address is also the address for the office of the registered agent, Draper's son, John Draper II. DFI documentation, Exhibit 1.

While at one time there may have been an argument that the plaintiff's claim actually is against the party to the lease, Viridian Group, LLC, and not

Draper individually (*see, e.g.,* Wis. Stat. § 183.0304(1), "[D]ebts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company. ... [A] member or manager of a limited liability company is not personally liable for any debt, obligation or liability of the limited liability company, except that a member or manager may become personally liable by his or her acts or conduct other than as a member or manager"; *see also Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶ 41, 297 Wis. 2d 606, 626, 724 N.W.2d 879), the fact is that the state court already has rendered a default judgment against Draper and in favor of the plaintiff on claims under the lease. Consequently, the *Rooker-Feldman* doctrine prevents this Court from acting as a state appellate court over that determination. *Brazelton Cedar Rapids Grp. LC,* 264 B.R. 195, 198–99 (Bankr. N.D. Iowa 2001)*; see also H & M Electric, Inc. v. Gee (In re Gee)*, Ch. 7 Case No. 17-12147, Adv. No. 17-75, 2018 WL 2472711, at *2 (Bankr. W.D. Wis. May 8, 2018).

In short, the plaintiff's proof of claim evidences a debt and damage amount that Draper did not rebut. For purposes of this proceeding, the Court will assume that the plaintiff's proof of claim establishes a debt of at least $40,817.88. It is not necessary for the Court to make further findings regarding the damages alleged because, regardless of the amount of debt between the plaintiff and Draper, and for the reasons set forth below, Robert 100 has not carried its burden to establish that the debt is nondischargeable.

## Dischargeability of Debt

Robert 100 argues that the debt Draper owes it is not dischargeable because all elements of 11 U.S.C. section 523(a)(2)(B) are met. To prevail under § 523(a)(2)(B), Robert 100, LLC must prove these elements:

(1) the debtor made a statement in writing;

(2) the statement was materially false;

(3) the statement concerned the debtor's or an insider's financial condition;

(4) in making the statement, the debtor had an intent to deceive the creditor; and

(5) the creditor actually and reasonably relied upon the statement.

*Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 507 F. 3d 610, 613 (7th Cir. 2007); *City Nat. Bank of Florida v. Sheridan (In re Sheridan)*, 57 F. 3d 627, 633 (7th Cir. 1995).  As noted above, the state court default judgment contained no factual findings.  While a bankruptcy court must give preclusive effect to state court judgments, it is not constrained under section 523 when the state court did not make findings that satisfy all the elements for nondischargeability.  *In re Gee*, 2018 WL 2472711, at *2.

At trial, both parties agreed that the financial statement at issue, Exhibit 3, was false, and that Viridian was not worth $12 million as of July, 2015.  Accordingly, the Court need only address the remaining four elements of section 523(a)(2)(B) against the proof offered by the parties.

1. <u>Did Draper Make a Statement in Writing?</u>

The plaintiff asserts that Draper used the financial statement, Exhibit 3, as a writing to obtain the benefit of the lease and that Draper signed the financial statement. (The plaintiff also asserts Draper signed the lease, but the plaintiff is not arguing that the lease constitutes a financial statement, which is the necessary element for a sec. 523(a)(2)(B) claim).  Draper denies signing either document.  Schmidt testified that he did not witness anyone sign the lease or the financial statement, because both documents were presented to him already signed.  There was no evidence that anyone else on behalf of the plaintiff witnessed the signatures.  John C. Draper II, the debtor's son and Viridian's president and COO, did not testify.

Draper testified that the signatures appearing on page 3 of the financial statement, Exhibit 3, and on the lease, Exhibit 2, are not his.  He testified that he did not see the financial statement until this litigation began, and that some of the dollar amounts on the financial statement appear incredible.  Draper

testified that, based on his experience, the signatures at issue are those of his son, John C. Draper II.

Lay testimony can be sufficient to identify handwriting. According to Federal Rule of Evidence 901 "Authenticating or Identifying Evidence":

> (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> (b) Examples. The following are examples only — not a complete list — of evidence that satisfies the requirement: … (2) Nonexpert Opinion About Handwriting. A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.…

Federal Rule of Evidence 901(b)(2) permits the introduction of "'[a] nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.'" *Berkowitz v. Berkowitz,* 817 F. 3d 809, 813 (1st Cir. 2016) (quoting Fed. R. Evid. 901(b)(2)). In *Berkowitz*, the nonexpert testified that he developed his familiarity with the handwriting at issue based on both correspondence between himself and the writer and his review, over a three-month period, of the prescriptions the writer wrote in her practice as a podiatrist. *Id.*

Here, Draper, a nonexpert, has had lifelong familiarity with his own handwriting, and some years of familiarity with his son's handwriting. The latter familiarity is due not only to familial relationship, but because Draper helped launch his son in business. Exhibit 1 shows that Draper and son established Viridian Group, LLC (Wisconsin) at least as early as April, 2012, giving them some time over the course of four years to work together in a business setting before Draper had occasion to testify.

In reviewing the evidence, the Court finds that there are differences in the signatures offered by the plaintiff and those offered by Draper, differences apparent to the untrained eye. Neither of the signatures offered by the plaintiff include an upper loop on the "J" in John, while the both of the signatures

offered by Draper show an upper and lower loop on the "J" in John. There are other differences, also apparent to the untrained eye.

Exhibit 2, the lease (CM-ECF Doc. No. 14-1, at 42).

Exhibit 3, the financial statement (CM-ECF Doc. No. 14-2, at 3).

Exhibit 100, Draper's bankruptcy petition (CM-ECF Doc. No. 13, at 1).

Exhibit 101, Draper's legal services agreement (CM-ECF Doc. No. 13, at 2).

 Despite the plaintiff having the burden of proof by a preponderance of the evidence, *Grogan*, 498 U.S. at 291, Robert 100 did not offer any evidence to contradict Draper's evidence regarding authenticity of the signatures. Accordingly, based on the uncontroverted testimony and the visual evidence, the Court finds that defendant Draper did not make a statement in writing,

because the signature on the financial statement was not made by Draper, and it is undisputed that someone other than Draper presented the documents to Schmidt.

> 2. <u>Was Exhibit 3 a written statement respecting the debtor's or an insider's financial condition?</u>

The plaintiff asserts that Draper used a written financial statement, Exhibit 3, to obtain the benefit of the lease. Draper does not deny that at least a portion of Exhibit 3 purports to be a written financial statement.

The Bankruptcy Code does not define "statement respecting financial condition." *Associated Bank, N.A., v. Kraft (In re Kraft)*, Ch. 7 Case No. 16-22095, Adv. No. 16-02233, 2017 WL 1373258, at *2 (Bankr. E.D. Wis. April 13, 2017). Prior to *Lamar Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018), the Seventh Circuit had not adopted its own definition for this term. *See Stelmokas v. Kodzius*, 460 Fed. Appx. 600, 603–04 (7th Cir. 2012) (discussing approaches within the Circuit). In *Lamar,* the Court explained that a "statement" is "the act or process of stating, reciting, or presenting orally or on paper; something stated as a report or narrative; a single declaration or remark." *Lamar*, 138 S. Ct. at 1759 (quoting Webster's Third New International Dictionary 2229 (1976)). A statement "as to one's financial condition" is not limited to one's overall financial status, but is broader and means a statement that "has a direct relation to or impact on the debtor's overall financial status." *Id.* at 1761.

The Bankruptcy Code defines "insider" to include:

> (A) if the debtor is an individual – (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control . . . .

11 U.S.C. § 101(31). Under this definition, Viridian Group, LLC is an insider of the debtor Draper. *See In re Cohen,* 334 B.R. 392 (Bankr. N.D. Ill 2005) (ruling that statement concerned debtor's financial condition because it concerned his company's financial condition). Even considering that the Wisconsin LLC had

been administratively dissolved before the lease with Robert 100 was signed, the Code's definition of corporation includes an unincorporated company or association, *see* 11 U.S.C. § 101(9)(A)(iv), *John Hancock Life Ins. Co. v. Litas* (*In re Litas*), Ch. 7 Case No. 05-B-34536, Adv. No. 05-A-2637, 2006 WL 1075416, at *3 (Bankr. N.D. Ill. April 24, 2006) (concluding that sec. 523(a)2)(B) could apply even if debtor made statements before company was incorporated), such that Viridian Group, LLC remains an insider of the debtor.

Exhibit 3, appears to concern the Michigan Viridian. Page 1 of the exhibit is a July 6, 2015 letter from Chase Bank, Lathrup Village, Michigan, listing a Birmingham, Michigan address in the upper right corner. According to the letter, JCD I and JCD II, as LLC members, were both signers for the account owned by PI 123100 LLC. The Court finds that Page 1 of Exhibit 3 does not respect the debtor's or an insider's financial condition, other than reflecting that an account exists and has two signers, one of whom is Draper.

Draper testified he is or was a member of Viridian (Michigan). Page 2 of Exhibit 3 includes a deposit account balance summary from Chase Bank in Southfield MI, regarding Viridian Group LLC at the Birmingham, Michigan address. Page 2 notes that two people named John C. Draper were authorized to sign on the deposit account, that the account was opened on November 3, 2014, and that, as of July 6, 2015, the balance was $8,164,613.14. Page 2 of Exhibit 3, titled Deposit Account Balance Summary, appears to be a statement in respect to Viridian Group LLC (of Michigan's) financial condition.

Page 3 does not have a heading, but has four columns: Assets, Amount(s), Liabilities and Amount(s). Assets included $8.5 million in cash, $10,000 in fixed assets, $3.9 million in franchise licenses and $220,000 in license options, for total assets of $12,630,000. Page 3 also appears to be a statement respecting financial condition, apparently of Viridian (Michigan) in which Draper testified that he is a member.

In sum, pages 2 and 3 of Exhibit 3 appear to be a written statement respecting the financial condition of Viridian, although the Court cannot determine if the specific entity is the Michigan LLC or the Wisconsin LLC about

which Draper testified. Given the broad definition embraced by the Supreme Court in *Lamar*, and the prior array of approaches endorsed within this circuit, *see Stelmokas*, 460 Fed. Appx. At 603–04, the Court finds that the plaintiff has established Exhibit 3 is a statement respecting the debtor's or an insider's financial condition.

3. <u>Was the written statement something on which creditor Robert 100 reasonably relied?</u>

For a debt to be nondischargeable pursuant to section 523(a)(2)(B), the creditor's reliance must have been both actual and reasonable. *Webster Bank, N.A. v. Contos (In re Contos)*, 417 B.R. 557, 566 (Bankr. N.D. Ill. 2009). While actual reliance is difficult to prove, it can be established by circumstantial evidence. The degree of reliance required – reasonable – is more stringent than justifiable reliance, and evidences Congressional intent to create a heightened bar to discharge exceptions. *Lamar,* 138 S. Ct. at 1763. As the Supreme Court explained, this heightened requirement was not erected to shield dishonest debtors, but to balance the potential misuse by both debtors and creditors of statements reflecting a debtor's financial condition. *Id.* at 1763–64.

Courts determine whether a creditor's reliance is reasonable on a case-by-case basis. *Nat'l Bank of Petersburg v. Bonnett (In re Bonnett)*, 895 F.2d 1155, 1157 (7th Cir. 1989). One way of determining reasonable reliance is to examine whether the creditor followed its own established lending procedures. *See Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1174 (7th Cir. 1990). Even so, bankruptcy judges should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices." *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1256 (7th Cir. 1980). Courts often consider the creditor's standard practices in evaluating credit-worthiness, the industry standards or customs, and the circumstances at the time of the application for credit. *Colchester State Bank v. Phillips (In re Phillips),* 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007).

Normally, "the concept of reasonable reliance does not … require creditors to conduct an investigation prior to entering into agreements with

prospective debtors." *In re Morris*, 223 F.3d at 554. On occasion, reliance may be deemed unreasonable where a creditor "possesses information sufficient to call the representation into question." *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995). A creditor should not ignore evidence of untruthfulness with the expectation that an exception to a debtor's discharge will be granted. *In re Bogstad*, 779 F.2d 370, 372 n.4 (7th Cir. 1985); *see also Lamar*, 138 S. Ct. at 1763–64 (describing Congressional balancing of debtor and creditor potential misuses of the financial statements). Creditors should pursue "obvious red flags." *Harris, N.A. v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 902 (Bankr. N.D. Ill. 2013) (finding bank unreasonably relied on financial statement by disregarding contradictions within the document, and written in different handwriting and different colored inks).

Here, Schmidt was approached by broker Minkin, a broker representing Viridian. Schmidt offered no testimony that he had dealt with Minkin before. Schmidt was given only Exhibit 3, which included a brokerage deposit summary for a Michigan Bank (Chase) and concerned the Viridian Group LLC with a Michigan address. Mr. Schmidt testified he reviewed only the financial statement before he executed the lease and that he relied on the information within those pages before signing the lease. Schmidt also acknowledged that, although he thought the stated franchise value "was a big number," he conducted no further investigation. Nor did he collect a security deposit at the time he signed the lease, even though the lease provided that he would do so. He stated that it had been a practice to receive security deposits along with first rent payments.

Draper contends that Mr. Schmidt, as an experienced commercial developer and lessor, should have checked publicly available records such as the Wisconsin DFI records online to determine whether Viridian Group, LLC was a Wisconsin LLC in good standing at the time he signed the lease. Draper also asserts that the plaintiff's reliance was not reasonable because Schmidt did not have his own broker investigate Viridian's bona fides. Schmidt had no

information about Viridian's ability to conduct business in Wisconsin. Draper points out that Exhibit 3, the financial statement, apparently concerned a Michigan entity.

The evidence shows Schmidt and Robert 100 were trying to fill a new mall, apparently still under construction. Viridian was referred to him via a third party, a commercial broker, and he relied upon the strength of Exhibit 3. Schmidt undertook improvements based on a signed lease but without collecting any security deposit or undertaking any independent verification of this new tenant, other than some internet research on the Pie Five concept. Schmidt never spoke with any principals of Viridian or Pie Five before the default.

While there is little doubt it would have been easy for Schmidt to check the corporate standing of Viridian by using a state database, reliance for purposes of the fraud discharge exception does not require reasonable investigation, *In re Mayer*, 51 F.3d at 675 (addressing sec. 523(a)(2)(A) claim). Learning that Viridian had been administratively dissolved a month earlier likely would have raised questions in addition to the implicit question Schmidt didn't pursue – was the $3.9 million franchise value plausible? – beyond his discussion with the broker about the 1—franchise opportunities. But as the Seventh Circuit explained, reliance "excludes recovery if the investor knows or suspects the truth. Reliance [is] the conjunction of a material misrepresentation with causation in fact." *Id.* at 676. Here, aside from Schmidt's impression that the stated worth of the franchise licenses was "a big number," there is no evidence he knew or suspected the financial statement or bank summary was false, or that the Viridian Group, LLC described in the financial statement would be ineligible to do business in Wisconsin. Instead, he accepted the financial statements on their face,[2] pursued his practice of waiting for the security deposit until the first month's rent came due, and

---

[2] Schmidt's testimony about his calls to the banker at Chase Bank in Michigan is unclear as to whether those calls were made before or after the lease default.

undertook improvements to suit the new tenant. Wondering about the value of the franchise licenses, particularly in light of the large amount of cash reserves shown, does not constitute a "red flag" or closing one's eyes to contradictory information. *See, e.g., In re Gunsteen*, 487 B.R. at 902.

Another factor to be weighed, briefly, is Schmidt's statement that since this episode, he has changed his procedure for assessing potential new tenants. Based on the guidance provided by caselaw, the Court will not deem the plaintiff's reliance in July 2015 "unreasonable" simply because, post-incident, the plaintiff has sharpened its pre-leasing investigation practices. Courts are to consider circumstances at the time of the application for credit, *see In re Phillips*, 367 B.R. at 645, and not be overly swayed by later-gained prudence.

In sum, Robert 100 has met its burden by the preponderance of the evidence to show it actually and reasonably relied on the financial statements presented.

4. <u>Did Draper cause the written statement to be made or published with intent to deceive?</u>

"Where a person knowingly or recklessly makes a false representation which that person knows or should know would induce another to make a loan, intent to deceive logically may be inferred." *Regency Nat'l Bank v. Blatz (In re Blatz)*, 37 B.R. 401, 404 (Bankr. E.D. Wis. 1984), *citing In re Garman*, 643 F.2d at 1252. It is a different scenario when the defendant denies making any statement at all to the plaintiff.

The plaintiff's claim under § 523(a)(2)(B) failed in *F.D.I.C. v. Barrick (In re Barrick)*, 518 B.R. 453 (Bankr. N.D. Ill. 2014), because the debtor did not make the false statements, much less do so with the requisite intent to deceive. There, the defendant and another witness both testified without contradiction that the loan application relied upon by the creditor in making the loan was different from the application they had signed; and, the plaintiff offered no evidence to contradict evidence offered by the debtor. The *Barrick* court found that the plaintiff failed to satisfy its burden of proving that the debtor caused a

materially false writing to be issued with the intent to deceive and to secure the loan. *In re Barrick,* 518 B.R. at 461.

The facts here are analogous to those in *Barrick*. Draper denies that he ever saw the financial statement, much less sign or provide it to Robert 100. He denies intending to deceive the plaintiff. Draper also denies that he knew any specifics about narrowing the decision to locate a Wisconsin Pie Five Pizza restaurant to the West Allis location. Moreover, Draper denies that he authorized anyone to use or disclose his financial information for this purpose. Draper asserts that he never took the LLC's operational reins, only getting involved near the end of the LLC's existence to manage payroll and make a deposit. Despite his title as CEO, Draper testified he was never involved in the LLC's day-to-day affairs. He testified, without challenge, that it was his son's responsibility to find suitable restaurant locations. Finally, Draper stated that the LLC never opened a restaurant in Wisconsin because there was not enough cash flow and the entity did not find a suitable location.

Mr. Schmidt's testimony corroborates some of Draper's evidence. Schmidt testified that he did not meet or speak with Draper or his son before signing the lease.

The Court finds that the plaintiff has failed to establish that Draper caused the written statement to be made or published with intent to deceive. Not only did Draper not make the statement, Draper had no intent to deceive. Draper testified that his son made the statements at issue, and Draper had no awareness of the West Allis negotiations. To Draper's knowledge, the entity had only $30,000, and not over $12 million, in any checking account. Draper's testimony was largely undisputed.

## Partnership Liability

On closing argument, the plaintiff's counsel offered an alternative legal theory. He argued that, even if the signatures on the financial statement and

lease are not those of Draper, Wisconsin Statute section 178[3] makes Draper liable for the acts of any partnership of which he is a member. Therefore, Robert 100 argued, even if Draper's son presented the financial statements to the plaintiff, Draper should be liable for that presentation because Viridian Group, LLC had already been administratively dissolved, and Draper and his son were, upon dissolution and by operation of statute, not LLC members but business partners.

This alternative theory might have some weight where Robert 100 is seeking to establish Draper's liability for a debt. But the Court has already concluded that Draper owes Robert 100 a debt. The problem comes when the plaintiff wants to make "joint liability" more or less the same as "joint nondischargeability." Robert 100's theory about Ch. 178 partnership elides the separate factors under 11 U.S.C. § 523(a)(2)(B), and would effectively substitute a different individual's intent for the debtor's. State partnership law may permit joint liability for some debts, but bankruptcy nondischargeability law looks to the specific debtor: "a statement in writing . . . that *the debtor* caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)B)(iv) (emphasis supplied). The plaintiff's argument under Wis. Stat. sec. 178 fails.

## CONCLUSION

Exceptions to discharge of a debt are construed strictly against the creditor and liberally in favor of the debtor in order to serve the Code policy of granting debtors a fresh start. For the reasons set forth above, the Court finds that plaintiff Robert 100, LLC has established under section 523(a)(2)(B) only that the written financial statement was false, that the statement respected the debtor's or an insider's financial condition, and that the plaintiff's reliance on the statement was reasonable, but the plaintiff has failed to establish that

---

[3] *See* Wis. Stat. § 178.0202 ("Formation of partnership. (1) Except as otherwise provided in sub. (2), the association of 2 or more persons to carry on, as co-owners, a business for profit forms a partnership, whether or not the persons intend to form a partnership.");Wis. Stat. § 178.0306 ("Partner's liability. (1) Except as otherwise provided in subs. (2) to (3m), all partners are liable jointly and severally for all debts, obligations, and other liabilities of the partnership unless otherwise agreed by the claimant or provided by law.").

Draper signed the statement or acted with fraudulent intent. The Court therefore ORDERS that the amounts asserted as a debt owed to the plaintiff are dischargeable, and DISMISSES the plaintiff's complaint with prejudice.

Dated: November 27, 2018

By the Court:

Beth E. Hanan
United States Bankruptcy Judge